IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| JASMIN ROWLETT, *Plaintiff* v. BALTIMORE POLICE DEPARTMENT, RICHARD WORLEY, JONATHAN AMEY, CHRISCHELLE ROMAN-TAYLOR, and LISA RIHA. *Defendants.* | C.A. No: _____ (Jury Trial Demanded) |

## COMPLAINT

### INTRODUCTION

1.      This is an action for money damages brought by Jasmin Rowlett ("Ms. Rowlett" or "the Plaintiff") pursuant to 42 U.S.C § 1983, the First Amendment to the United States Constitution, the Fourteenth Amendment to the United Sates Constitution,  42 U.S.C § 2000e, 29 U.S.C. § 2615, and the Maryland Wage Payment and Collection Law against the Defendants, Baltimore Police Department ("BPD") in its capacity as a municipality, and Commissioner Richard Worley ("Commissioner Worley"), Jonathan Amey ("Major Amey"), Chrischelle Roman-Taylor ("Deputy Director Roman-Taylor") and Lisa Riha ("Detective Riha") in their individual capacities.

2.      Jurisdiction is based upon 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a) as the issues presented are questions of federal law, or issues of Maryland law that arising out of the same facts and controversy.

3.      It is alleged that the Defendants retaliated against the Plaintiff for engaging in

1

protected speech, namely, filing civil lawsuits and reporting matters of public concern to the EEOC involving ongoing racial and gender discrimination and for exercising rights protected by the Family and Medical Leave Act ("FMLA"). The Defendants' retaliation deprived the Plaintiff of rights guaranteed by the Constitution of the United States by 1) weaponizing the investigative and disciplinary powers of BPD's Public Integrity Bureau ("PIB") including forging internal documents in an attempt to revive expired charges and retaliate against Ms. Rowlett under the pretext of internal discipline for those charges; 2) denying and interfering with leave protected by the FMLA; 3) denying a leave of absence authorized by BPD Policy 1727; 4) terminating her; and 5) damaging the Plaintiff's reputation and causing a stigma that was intended to foreclose future employment opportunities. The way in which the Defendants retaliated is consistent with a documented pattern and practice of retaliating against members of BPD that report misconduct and has a chilling effect on the reporting of similar violations.

4.      It is also alleged that BPD proximately caused the constitutional violations inflicted by Commissioner Worley and Major Amey because BPD maintains a policy, custom, or practice of retaliating against employees that file internal complaints alleging officer misconduct or complaints to outside agencies alleging the same, including discrimination and retaliation.

5.      For the purposes of this Complaint, the policy of retaliation stems from the actions of Commissioner Worley and Deputy Commissioner Brian Nadeau; each final policymakers of BPD as it relates to conducting internal investigations, disciplining officers for findings made in PIB investigations, and terminating employees of BPD. Further, this Complaint alleges that at the time Ms. Rowlett engaged in protected activity, BPD officers that had previously reported misconduct to PIB either experienced retaliation or feared that they would because retaliation was an official practice and custom of BPD.

2

**PARTIES**

6.      Ms. Rowlett worked as a police officer for BPD for sixteen (16) years, reaching the rank of Sergeant. She is an African American woman, a single mother to four children, a resident of Baltimore, Maryland and is of full age.

7.      Defendant Baltimore Police Department is a municipal entity and an agency of the City of Baltimore, organized under the laws of the State of Maryland. BPD operates as a municipal police force, and courts have recognized that it may be sued under 42 U.S.C. § 1983 for constitutional violations carried out by its officers or pursuant to its policies, practices, and customs. BPD is responsible for establishing, implementing, and enforcing policies, procedures, and customs related to policing in Baltimore, and it acts under color of state law for purposes of § 1983. As such, BPD is a "person" within the meaning of 42 U.S.C. § 1983 and may be held liable for violations of constitutional rights resulting from official policies, widespread customs or practices, and the deliberate indifference of policymakers.

8.      Defendant, Richard Worley, was sworn in as Commissioner of BPD on October 5, 2023. In his capacity as Police Commissioner, Worley oversees all aspects of BPD. Integral to BPD's efforts to comply with the Consent Decree was the creation of the Public Integrity Bureau and the Department of Justice's mandate that the Bureau implement policies to ensure that complaints of misconduct, including discrimination and retaliation, are investigated in a thorough, fair, impartial and timely manner. In his capacity as Commissioner, Worley approved the proposed disciplinary sanctions for members of BPD whose charges were sustained by PIB. In this case, his termination of the Plaintiff was prejudicial to the Plaintiff's statutory and constitutional rights and chilled the rights of others to report misconduct and discrimination.

9.      Defendant Jonathan Amey holds the rank of Major at BPD. In late 2022, Major Amey was assigned to be the Major of the Northeast District of BPD and was the highest-ranking supervisor of that district. He remained in that position until December 3, 2023, when

3

he was transferred to be the Chief of the Performance Standards Section, which falls under the command of Deputy Commissioner Brian Nadeau. On information and belief, Major Amey maintains close personal relationships with Major Natalie Preston and Deputy Director of BPD's HR Section, Chrischelle Roman-Taylor.

10.    Defendant Chrischelle Roman-Taylor was promoted to Deputy Director of Human Resources on June 10, 2024, after previously serving as an HR Business Partner. During the facts alleged in this Complaint, Deputy Director Roman-Taylor was responsible for making leave determinations for leave applications made pursuant to state and federal law and BPD policy. Her role is situated within Deputy Commissioner Nadeau's chain of command.

11.    Defendant Lisa Riha serves as a Detective in PIB and works as an Officer of Administrative Hearings. In her role as Officer of Administrative Hearings, Detective Riha is responsible for serving administrative charging documents and scheduling and conducting hearings before the Office of Administrative Hearings. Her role is situated within Deputy Commissioner Nadeau's chain of command.

### RELEVANT BACKGROUND AND APPLICABLE BPD POLICIES

12.    BPD has a storied and notorious history of officer misconduct and unconstitutional policing practices.

13.    On April 7, 2017, the Baltimore Police Department, the Mayor and City Council of Baltimore, and the United States Department of Justice entered into a Consent Decree aimed at addressing a pattern and practice of unconstitutional policing that has plagued public safety efforts and harmed the citizens of Baltimore for decades. Central to the mandated reform of BPD was the premise that BPD must first effectively police itself through thorough, transparent and fair internal investigations.

14.    The Public Integrity Bureau is the bureau within BPD that is tasked with investigating allegations of misconduct including violations of BPD's policies, or state or

federal law, by BPD and its members. PIB is led by Deputy Commissioner Brian Nadeau. The Bureau consists numerous divisions, including the Public Integrity Division which is responsible for investigating complaints of misconduct to include violations of state and federal anti-discrimination and anti-retaliation law and BPD's anti-discrimination and anti-retaliation policies; the Compliance Division which develops and implements policies, trainings and systems of accountability; and the Finance and Personnel Services Division, which includes BPD's Human Resources Section.

15.     As part of its efforts to comply with mandated reforms, PIB adopted the PIB Internal Operations and Training Manual ("the PIB Manual"). The PIB Manual is the codification of the carefully crafted reforms mandated by the Consent Decree. Its creation and adoption have been praised in testimony given before the Court overseeing the Consent Decree as a collaborative effort between the DOJ, the BPD, the Monitoring Team, and the public. It took two years to develop after having every word painstakingly reviewed. The PIB Manual was created with the specific intent of being a practical set of policies that would ensure every investigation is conducted comprehensively and concluded timely.

16.     The Manual provides that PIB's goal is to ensure that all BPD members perform in a manner consistent with the expectations and policies of BPD, as well as local, state, and federal laws.[1]

17.     The Manual requires administrative investigations to be completed within 90 days from the date of the complaint and authorizes an extension of time only upon written approval of Deputy Commissioner Nadeau.[2]

18.     The Manual provides that only Deputy Commissioner Nadeau, or his designee, can make a final determination as to investigative findings.[3]

---

[1] Exhibit 1 – PIB Internal Operations and Training Manual, pg. 53
[2] Exhibit 2 – PIB Internal Operations and Training Manual, pg. 62
[3] Exhibit 3 – PIB Internal Operations and Training Manual, pp 121-123

19.     The Manual was implemented after approval of the Court overseeing the Consent Decree in November of 2019.

20.     In response to BPD's long history of corruption and mistrust by the public, in 2018 the Maryland General Assembly established the Commission to Restore Trust in Policing ("the Commission").

21.     The Commission conducted a two-year investigation into the Baltimore Police Department, which included surveys and interviews of current and former members of BPD, in order to study the issue of corruption and enact meaningful reform.

22.     On December 2, 2020, the Commission published its findings in a report submitted to Governor Hogan, the Maryland Senate, and the House of Delegates. The report noted results from a survey of 2,800 active, sworn members of BPD that was conducted from August 11, 2020, through September 10, 2020.  The responses captured the experience of officers that had observed and reported misconduct. The results were shocking, and the Commission reported:

> "When those who reported were asked if they felt the matter was handled properly, about 69% said no. Some respondents expressed frustration that "nothing happened" to the officer they reported. Others criticized the quality or efficiency of the investigation conducted by Internal Affairs.
>
> The information obtained by the Commission indicates that fear of retaliation is a powerful disincentive for reporting misconduct in the BPD. More than half of the officers who did report misconduct (about 56%) felt that they suffered negative consequences as a result. The overwhelming majority of survey respondents said they would report corruption if they observed in the future, but many added that they would feel uncomfortable doing so unless they could report anonymously, out of fear that they would otherwise be subjected to retaliation or labeled a "rat" or a "snitch." As one respondent put it, the BPD instills fear that if you "snitch," you could ruin your career; the reporting officer gets a reputation for being untrustworthy, while the offending officer goes unpunished.
>
> Several respondents who reported misconduct in the past said they would not do so again based on the retaliation they had suffered. In just one example, an officer reported that after he filed a complaint against a member of his squad for overtime fraud, the offending officer filed a retaliatory complaint against him and other squad members in response. At the time of the survey, both complaints were still under investigation by Internal Affairs, and the officer who reported the overtime fraud had been removed from

his squad pending resolution of the offending officer's complaint. He said that if he had known that reporting the fraud would derail his own career, he never would have made the report.

…

The officers interviewed by counsel to the Commission also worried about facing retaliation for reporting misconduct. As one long-serving officer put it, 'Nobody knows how to get back better than a cop.' That officer observed that the practice of turning a blind eye to misconduct stems from a fear of retaliation. The officer insisted that the Department needs a mechanism to allow for the reporting of misconduct without repercussions." [4]

23.     The survey revealed that during the same period of protected activity engaged in by Ms. Rowlett as alleged herein, individuals that reported misconduct to PIB were justified in fearing, and in fact experienced, retaliation because of their complaints.

24.     On information and belief, Deputy Commissioner Nadeau does not require PIB investigators to follow the protocols set forth in the PIB Internal Operations and Training Manual.

25.     On information and belief, at the time of case intake, Deputy Commissioner Nadeau orders PIB investigators to tailor their investigations and recommend preordained findings that are consistent with his desired outcomes, specifically in "Red Ball" cases. Ms. Rowlett was told by PIB detectives that the cases that she brought or that were brought against her were "Red Ball" cases.

26.     On information and belief, Deputy Commissioner Nadeau orders PIB investigators to evaluate cases at a standard below a preponderance of evidence in order to reach his preordained recommendations.

27.     On information and belief, Deputy Commissioner Nadeau coerces and intimidates hearing officers assigned to the Office of Administrative Hearings ("OAH") to

---

[4] Exhibit 4 - Commission to Restore Trust in Policing Report, pp 105-107 December 2020.

ensure that OAH recommends disciplining respondents consistent with his pre-determined desires.[5]

28.     On information and belief, Deputy Commissioner Nadeau has a close personal relationship with Detective Lisa Riha, a Hearing Officer at OAH, and regularly communicates directly with Detective Riha regarding disciplinary recommendations in upcoming hearings.[6]

29.     Lisa Riha, at all times relevant to this complaint, was a Detective in PIB and the Officer of Administrative Hearings.

30.     On information and belief, Commissioner Worley was aware of, and endorsed, Deputy Commissioner Nadeau's tactics described above.

31.     Jonathan Amey's work history demonstrates how closely connected his role was to compliance, policy enforcement, and administrative oversight during the period relevant to the facts of this dispute, and how those functions operated under the direct oversight of Deputy Commissioner Brian Nadeau.[7]

32.     From July 2020 through June 2021, Amey served within the Compliance Bureau, and from June 2021 through November 2021, he served as Executive Officer over the Performance Standards Section. In those roles, his responsibilities included auditing body-worn camera usage, reviewing use-of-force incidents, and ensuring compliance with departmental policies and directives issued by senior leadership, including those under Nadeau's authority. These positions required him to evaluate employee conduct, enforce policy standards, and operate within cross-functional teams addressing administrative and compliance issues.

33.     Beginning in 2022, Chrischelle Roman-Taylor began working in the Human Resources Section, where she became directly responsible for handling leave and FMLA

---

[5] Exhibit 5 - Affidavit of Stephanie Lansey.
[6] *Id.*
[7] Exhibit 6 - BPD Organizational Chart

requests. Both HR and the Performance Standards and Compliance sections operate under PIB and Deputy Commissioner Nadeau. This places all three roles within a unified chain of command, where HR determinations, compliance oversight, and policy enforcement were interconnected and not operating in isolation.

34.     Major Amey's progression through the Compliance Bureau and into Performance Standards positioned him within the enforcement and oversight arm of BPD, while Ms. Roman-Taylor's role in HR placed her in control of employee leave determinations. Under Nadeau's oversight, these functions inherently require coordination, as HR decisions regarding leave directly determine whether an employee is considered compliant or in violation of policy, which then becomes subject to compliance review and policy enforcement.

35.     As is described further below, Ms. Rowlett filed several EEOC complaints and lawsuits that either accused Amey of discrimination and retaliation or accused people he was personally and professionally close to of the same. On information and belief, Ms. Rowlett became a well-known complainant within PIB's chain of command.

36.     Beginning in 2023 and continuing through her termination in 2025, the Defendants repeatedly mishandled and denied Ms. Rowlett's leave requests despite full knowledge of her medical condition and repeated submissions of necessary documentation. These denials resulted in her absences being treated as policy violations that were used to support AWOL charges and other disciplinary actions. These actions occurred under Deputy Commissioner Nadeau's command.

### FACTS

37.     On September 23, 2009, Ms. Rowlett was hired by BPD as an officer. She served in that role until she was promoted in June of 2016 to the rank of Sergeant.

38.     Between 2019 and 2025, Ms. Rowlett engaged in activity protected by the First Amendment and federal law. Specifically, Ms. Rowlett filed two federal lawsuits and numerous

EEOC complaints alleging discriminatory and retaliatory practices of BPD (a matter of public concern) protected by the Petition Clause and the Free Speech Clause of the First Amendment, and 42 U.SC. § 2000e. She spoke on-the-record in numerous media reports about the discrimination and retaliation that was the basis of her lawsuits, also protected by the Free Speech Clause of the First Amendment. Finally, she applied for leave under the FMLA, protected by 29 U.S.C. §2615.

39.     On October 2, 2019, Ms. Rowlett filed suit against BPD in the United States District Court for the District of Maryland wherein she alleged racial and gender discrimination in violation of Title VII, sexual harassment in violation of Title VII, and retaliation in violation of Title VII.[8]

40.     On March 6, 2020, U.S. Magistrate Judge A. David Copperhite issued an order of dismissal in accordance with Local Rule 111 after being advised that the parties reached a settlement.

41.     As a condition of the settlement, all open internal investigations before PIB (which Ms. Rowlett alleged were initiated against her in retaliation for her previously filed complaints with the EEOC) were dismissed. One of those complaints was CIU# 18-01359.

42.     On June 6, 2020, Ms. Rowlett filed an EEOC complaint alleging discrimination based on her race and sex, and retaliation for engaging in prior protected activity.

43.     On June 30, 2020, Ms. Rowlett delivered her fourth child by cesarean section.

44.     Approximately six months later, Ms. Rowlett began experiencing chronic acute abdominal pain. Her pain limited her ability to wear her duty belt and perform the daily functions of a patrol officer.

45.     Ms. Rowlett requested an accommodation in the form of an administrative assignment within BPD which would allow her to perform essential functions for the agency

---

[8] Exhibit 7 – Complaint, Case No. 1:19-cv-02896-ADC.

without requiring her to wear her duty belt. Thereafter she was transferred to an administrative role in the Northeast District.

46.      On May 17, 2021, Ms. Rowlett filed a complaint in the United States District Court for the District of Maryland wherein she again alleged racial and gender discrimination in violation of Title VII, sexual harassment in violation of Title VII, and retaliation in violation of Title VII.[9] The case was one of four cases filed by Black female sergeants against BPD accusing BPD of race-based discrimination, sexual harassment, and retaliation and received media attention. The complaint named Major Natalie Preston, one of Major Amey's close friends and his former supervisor, as one of the people who discriminated against and retaliated against Ms. Rowlett.

47.      Over the course of the next few months, Ms. Rowlett spoke publicly in numerous local and national media reports to discuss the allegations in her lawsuit. She stated that she was subjected to discrimination and retaliation for complaining of the same. She detailed that she was referred to as a "bitch" by co-workers and had a toy rat placed in her desk at work because she spoke out against BPD.[10]

48.      Ms. Rowlett's lawsuits, EEOC complaints, internal complaints, and public statements addressed broader matters of public concern, including discrimination, retaliation, and internal integrity within BPD.

---

[9] Exhibit 8 – Complaint, Case No. 1:21-cv-01205-BPG.

[10] Exhibit 9 – *4 sue BPD, alleging discrimination, sexual harassment, retaliation*, David Collins, WBAL (November 5, 2021); *Black women officers sue Baltimore Police Department over harassment, intimidation, and racial discrimination*, C.H., Revolt (November 6, 2021); *Black Women in Law Enforcement Speak Out About Toxic Workplaces*, Cory Smith, NBC4 Washington (December 17, 2021); *Black women officers sue Baltimore police for racial and gender discrimination,* Aisha Powell, Yahoo News (January 9, 2022).

See also; *Standing up to discrimination, harassment, and retaliation*, Ep 021: Strategies For Justice Podcast, Ep 021: https://www.youtube.com/live/Yb9z9w4C0-4, (December 14, 2021).

49. In October of 2022, Jonathan Amey was promoted to Major and transferred to the Northeast District.

50. In December of 2022, Ms. Rowlett was diagnosed with pelvic adhesion disease, a condition that involves the buildup of scar tissue that causes pelvic organs – such as the uterus, fallopian tubes, ovaries, and bowels – to stick together. Ms. Rowlett's pelvic adhesion disease caused chronic pain in her pelvis and was attributed to her cesarian section in 2020.

51. Ms. Rowlett informed her supervisor, Lieutenant Effland, a female, of her condition and of her need to continue in her administrative capacity. Lieutenant Effland supported Ms. Rowlett remaining in her administrative assignment.

52. On December 31, 2022, Major Amey removed Ms. Rowlett from her administrative position and moved her back to patrol despite knowledge of her medical limitations and her administrative duty accommodation.

53. Lieutenant Effland advocated for Ms. Rowlett to stay in her position because of her diagnosis. Because Lt. Effland advocated for Ms. Rowlett, Major Amey removed Lieutenant Effland from her administrative position as well.

54. On information and belief, both Ms. Rowlett and Ms. Effland were reassigned because of their gender and because they opposed what they believed to be discriminatory and retaliatory actions of Major Amey. Both were replaced with male officers, one of whom was suspended pending termination at the time of his transfer and was eventually terminated for falsifying internal documents.

55. The positions held by Ms. Rowlett and Ms. Effland were slated as full-time positions, not suitable for temporary assignments of individuals whose police powers were suspended pending disciplinary action.

56. After their transfers, the administrative unit that Ms. Rowlett and Ms. Effland were involuntarily transferred from was staffed exclusively by men.

12

57.     On March 21, 2023, Ms. Rowlett made a complaint through the online complaint system for PIB's Equal Opportunity and Diversity Section ("EODS") of the Public Integrity Division alleging discrimination and retaliation by Major Amey.

58.     On June 29, 2023, Ms. Rowlett made a complaint directly to EODS Director Akanni that alleged that Major Amey had discriminated against her based on her race and gender and retaliated against her for opposing the same.

59.     On July 25, 2023, Ms. Rowlett filed EEOC Complaint #531-2023-01998 that alleged racial and gender discrimination as well as retaliation for exercising her right to leave protected by FMLA.

60.     Ms. Rowlett's pelvic adhesion disease continued to progress, causing persistent and severe pain and limiting her ability to function at work. Accordingly, she was ordered to undergo a series of surgeries in the Spring of 2024.

61.     In March of 2024, Ms. Rowlett submitted paperwork to take a medical leave of absence for her upcoming surgeries. Her leave and status were updated on Workday – Baltimore City's human resources administrative program – to reflect that she was on approved leave.

62.     In March and May of 2024, Ms. Rowlett had surgeries to address her pelvic adhesion disease.

63.     In June of 2024, Ms. Rowlett returned to work per her doctor's orders and submitted medical documentation.

64.     Ms. Rowlett was then subjected to administrative charges, alleging that her leave for surgeries was unapproved and/or charging her with AWOL.

65.     In July of 2024, Ms. Rowlett applied for promotion to the rank of Lieutenant and was deemed eligible.

66. On October 18, 2024, Ms. Rowlett fell in a bathroom at BPD and suffered injuries to her head, left shoulder and left hand.

67. Following her work injury, Ms. Rowlett's workers' compensation physician placed her out of work in four-week intervals, subject to reevaluation. Ultimately the physician continued Ms. Rowlett on unable-to-work status through December 31, 2025, with reevaluation scheduled at that time to determine whether she was medically fit to return to work.

68. On October 31, 2024, Ms. Rowlett applied for intermittent FMLA to address her continuing flare-ups associated with her pelvic adhesion disease, while simultaneously addressing her work injury.

69. Ms. Rowlett communicated regularly with Deputy Director Roman-Taylor and Brandon Freeman of BPD's HR Section concerning that request and submitted all supporting paperwork.

70. On information and belief, BPD called Ms. Rowlett's physician and/or physician's office and attempted to influence, narrow, or reduce the duration and conditions of Ms. Rowlett's intermittent leave request.

71. During November of 2024, Ms. Rowlett's physician's office was required to repeatedly revise and resubmit FMLA paperwork in response to BPD's demands.

72. In November of 2024, after repeated revisions and communications with BPD, Ms. Rowlett was told by the staff at her physician's office that they had never had so much trouble with any other employer in connection with an FMLA certification.

73. Between December 19, 2024, and January 18, 2025, Workday reflected Ms. Rowlett's approved FMLA leave.

74. During that same period, Detective Walden of PIB repeatedly contacted Ms. Rowlett to inform her of new administrative charges filed against Ms. Rowlett alleging that she was AWOL.

75.     On December 31, 2024, Ms. Rowlett received a telephone call from Detective Walden during which Walden left a voicemail to notify Ms. Rowlett of additional AWOL-related charges. The call was placed during a period when BPD's own system still reflected Plaintiff as on FMLA leave and when BPD had medical documentation supporting Ms. Rowlett's inability to work.

76.     BPD's pursuit of AWOL-related charges during a period when Plaintiff's status in Workday reflected approved FMLA leave further demonstrates that Defendants were not processing Plaintiff's leave requests in good faith but were simultaneously building a disciplinary record against her.

77.     On or about January 9, 2025, Ms. Rowlett was informed that members of PIB were attempting to serve Ms. Rowlett with notice of a Trial Board hearing for CIU# 18-01359, the internal affairs complaint that was dismissed pursuant to the settlement of Ms. Rowlett's 2019 lawsuit.

78.     The hearing was scheduled for January 16, 2025, during Ms. Rowlett's period of approved leave as reflected in Workday.

79.     On January 10, 2025, BPD sent the notice of a Trial Board hearing to Ms. Rowlett's prior attorney, Dionna Lewis, Esq. The notice included a statement and signature of Detective Lisa Riha indicating that Attorney Lewis accepted service on behalf of Ms. Rowlett on July 27, 2020.

80.     That same day, after reviewing the documentation, Attorney Lewis wrote an email to Lisa Riha. In that letter, Attorney Lewis informed Detective Riha that the document was forged and that she was away on business travel on the date that she purportedly accepted service in-person.[11]

---

[11] Exhibit 10 - Emails from Dionna Lewis to Lisa Riha.

81.     The document indicated that Lisa Riha served Attorney Lewis on July 27, 2020, approximately one month after Ms. Rowlett filed the EEOC complaint that gave rise to her second federal lawsuit. Further, the charges in the document were dismissed pursuant to the settlement agreement between Ms. Rowlett and BPD months earlier in March of 2020.

82.     The document also included the signature of Major Amey dated October 3, 2019, one day after Ms. Rowlett filed her first lawsuit in federal court. At that time, Amey was assigned to an administrative role in BPD's Medical Section and would not have had access to Ms. Rowlett's administrative charge, or authority to approve the proposed charging document. He did not assume his position with PIB's Compliance Bureau until June of 2020.

83.     On information and belief, the service document was backdated, manipulated, forged, or otherwise manufactured to create the false appearance of timely and valid administrative process.

84.     On information and belief, after Detective Riha was notified that the purported service document was false, that service could not have occurred as represented, that Attorney Lewis had been away on business, that Plaintiff herself had been home recovering from a cesarean section during the relevant July 2020 period, that Attorney Lewis had also communicated directly with BPD's Legal Affairs team concerning the invalid document and impossibility of service, and that the underlying matter was already expired or dismissed, Riha failed to report the apparent forgery or initiate internal reporting required by BPD policy.

85.     On information and belief, the attempt to revive CIU# 18-01359 and the use of the facially irregular service document were undertaken to retaliate against Plaintiff for her prior lawsuits, EEOC activity, internal complaints, and public speech.

86.     On January 30, 2025, a friend of Ms. Rowlett, who is a detective in PIB, sent Ms. Rowlett a text message warning her that detectives from PIB were going to surprise her at

her scheduled doctor's appointment and attempt to coerce her to sign for charges of four expired PIB cases, including the charge appearing in the forged document.

87.     Ms. Rowlett texted Sergeant Scott of BPD's Administrative Duties Division and told him that news of PIB's plans caused her to have a panic attack and miss a required doctor's appointment.

88.     On information and belief, BPD's attempted ambush of Ms. Rowlett at her scheduled medical appointment was intended to intimidate Plaintiff, interfere with her FMLA application, retaliate against her for attempting to use FMLA leave, retaliate against her for prior EEOC complaints, lawsuits and protected speech, and/or create a pretext for further retaliation under the guise of administrative discipline.

89.     On February 11, 2025, BPD denied Ms. Rowlett's FMLA request. That same day, Ms. Rowlett sent a written response to Deputy Director Roman-Taylor and others at BPD objecting to that denial.

90.     In that email, Ms. Rowlett explained that she had regularly communicated with BPD throughout December 2024 to clarify any perceived discrepancy relating to the number of flare-up days reflected in her physician's certification, and that BPD failed to respond.

91.     Ms. Rowlett expressly invoked federal FMLA regulations and challenged BPD's failure to timely identify and resolve alleged certification deficiencies, she challenged BPD's failure to timely provide approval or denial within the required regulatory period, and she formally requested copies of all correspondence between BPD and her healthcare provider concerning any request for additional or updated certification.

92.     Ms. Rowlett stated that BPD's delay and denial violated federal FMLA requirements and demanded a formal response and the requested records by February 18, 2025. She further warned that if the matter was not promptly addressed, she would escalate her concerns to the United States Department of Labor for further review.

93.    On February 12, 2025, BPD confirmed their revocation Ms. Rowlett's FMLA leave, citing issues with obtaining information from Ms. Rowlett's doctor.

94.    On February 20, 2025, Ms. Rowlett formally requested an unpaid leave of absence pursuant to BPD Policy 1727 by written email. Policy 1727 is intended to provide leave to officers experiencing prolonged medical challenges when FMLA and other benefits are exhausted.

95.    On March 7, 2025, Ms. Rowlett wrote an email to BPD complaining about her retaliation relating to her FMLA requests, failure to accommodate her disability, and of being subjected to a hostile work environment.

96.    On March 18, 2025, Ms. Rowlett again requested an unpaid leave of absence pursuant to BPD Policy # 1727. Ms. Rowlett made this request because of BPD's interference with her FMLA application.

97.    On March 21, 2025, Deputy Director Roman-Taylor emailed a letter to Ms. Rowlett signed by Commissioner Worley that terminated her employment.[12]

98.    The tone and content of the termination letter were unusually scathing, degrading, and humiliating. It marked a sharp and unexplained break from Ms. Rowlett's actual performance record. On information and belief, the letter was reasonably calculated to destroy her professional standing, foreclose future law-enforcement employment, and break her down emotionally and financially.

99.    On April 17, 2025, Ms. Rowlett's application for unemployment benefits was denied because BPD told the Maryland Department of Labor's Division of Unemployment Insurance that she voluntarily resigned from her position.

100.    At the time of her termination, Ms. Rowlett had at least seventeen hours of accrued and unused paid leave.

---

[12] Exhibit 11 – Termination Letter.

18

101. Ms. Rowlett did not receive payment for that accrued leave after her termination.

102. On November 3, 2025, Ms. Rowlett amended her previously filed complaint of discrimination and retaliation in EEOC Complaint #531-2023-01998 to include incidents that occurred following her original complaint and alleging that BPD continuously discriminated against her on the basis of her race, gender, and attempts to use leave protected by FMLA and retaliated against her for opposing the same. The case was transferred to the Maryland Commission on Civil Rights ("MCCR").

103. On December 30, 2025, MCCR closed its case at the request of Ms. Rowlett pending the EEOC's issuance of a Notice of Right to Sue.

104. On January 9, 2026, the EEOC issued Ms. Rowlett a Notice of Right to Sue.

105. All administrative prerequisites have been exhausted, and this action is filed within the statute of limitations.

106. Ms. Rowlett has still not been able to find work.

107. On information and belief, the content of Commissioner Worley's termination letter and the manner of Ms. Rowlett's separation mirror statements and references that BPD has made to prospective employers. Those statements have damaged her professional reputation and foreclosed employment opportunities.

108. As a direct and proximate result of the acts of the Defendants described herein, Ms. Rowlett suffered the following injuries and damages;

    a. Violation of her rights guaranteed by the First Amendment to the United States Constitution;

    b. Emotional distress;

    c. Economic loss in the form of lost wages, retirement benefits, and professional opportunities;

d.  Damage to her career and reputation.

## CLAIMS FOR RELIEF

### COUNT I
### First Amendment Retaliation in Violation of 42 U.S.C. § 1983 Against BPD

109.    The Plaintiff repeats and re-alleges the above paragraphs as if each were set forth herein.

110.    At all times relevant to this complaint, the Baltimore Police Department maintained policies or customs exhibiting deliberate indifference to the constitutional rights of and protections for individuals who reported misconduct.

111.    Deputy Commissioner Nadeau, designated as a final policy maker through his inherent position of authority as well as the BPD policies that designate him as the final authority in making investigative findings, routinely interfered with and/or halted investigations and solicited, encouraged, and demanded acts of retaliation by his subordinates against individuals who reported misconduct.

112.    Commissioner Worley, designated as a final policy maker through his inherent position of authority as well as BPD policies that designate him as the final authority for disciplinary and personnel actions, endorsed acts of retaliation by his subordinates against individuals who reported misconduct.

113.    Clear evidence of this policy of retaliation is established by the Consent Decree itself, the findings of the Commission to Restore Trust in Policing, and the actions described herein.

114.    The above-described policies and customs demonstrated a deliberate indifference on the part of the policymakers of the Baltimore Police Department to the well-established constitutional rights of members of BPD who report misconduct and were the cause of the violations of the Plaintiff's rights alleged herein.

115.    As a direct and proximate result of BPD's actions described herein the Plaintiff was deprived of rights guaranteed to her by the First Amendment to the Constitution of the United States and has suffered and continue to suffer other damages to include loss of wages, loss of employment benefits, loss of personal and professional reputation, emotional distress, and mental suffering.

## COUNT II
### First Amendment Retaliation in Violation of 42 U.S.C. § 1983 Against Individual Defendants

116.    The Plaintiff repeats and re-alleges the above paragraphs as if each were set forth herein.

117.    The conduct of the individual Defendants described herein was intended to deprive the Plaintiff of rights guaranteed under the First to the United States Constitution.

118.    The conduct undertaken by the individual Defendants described herein was under color of law, custom and usage and by the authority given to them by state law in their capacity as officers and agents of the BPD and was in violation of 42 U.S.C. § 1983.

119.    At the time of the conduct alleged, it was clearly established that public employees could not be retaliated against for speaking as citizens on matters of public concern, including speech addressing governmental misconduct, discrimination, retaliation, and integrity failures in law enforcement.

120.    As a direct and proximate result of the Defendants' retaliatory actions the Plaintiff was deprived of rights guaranteed to her by the First Amendment to the United States Constitution and has suffered and continues to suffer other damages to include loss of wages, loss of employment benefits, loss of personal and professional reputation, emotional distress, and mental suffering.

121.    The actions of the Defendants described herein were undertaken maliciously or with reckless disregard for the constitutional rights of the Plaintiff.

## COUNT III
### FMLA Retaliation in Violation of 29 U.S.C. § 2615 Against BPD

122.    The Plaintiff repeats and re-alleges the above paragraphs as if each were set forth herein.

123.    At all times relevant to this Complaint, the Defendant BPD was an employer, and the Plaintiff was an employee within the meaning of 29 U.S.C. § 2611.

124.    At all times relevant to this Complaint, the individual Defendants acted as agents of BPD.

125.    The Plaintiff engaged in protected activity when she applied for and/or used leave protected by the FMLA, and because she opposed practices she reasonably believed violated the FMLA.

126.    By the conduct alleged herein, the Defendant took adverse action against the Plaintiff because she engaged in that protected activity.

127.    The Defendant's adverse actions include forging internal documents to revive expired charges, intimidating the Plaintiff by ambushing her at her scheduled medical appointments, denying valid leave requests pursuant to the FMLA and BPD policy, and terminating her employment.

128.    Such conduct was in violation of 29 U.S.C. § 2615 and undertaken willfully and in bad faith.

129.    As a direct and proximate result of the Defendants' unlawful termination, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of wages, loss of employment benefits, loss of personal and professional reputation, emotional distress, and mental suffering.

## COUNT IV
### FMLA Interference in Violation of 29 U.S.C. § 2615 Against BPD

22

130. The Plaintiff repeats and re-alleges the above paragraphs as if each were set forth herein.

131. The Plaintiff suffered from serious health conditions, including injuries resulting from her October 18, 2024, fall and continuing flare-ups of pelvic adhesion disease, that qualified her for FMLA protection.

132. The Plaintiff gave sufficient notice of her intent to take FMLA leave and submitted all required documentation in support of her application.

133. By the conduct alleged herein, the Defendant interfered with her application to use protected leave by, among other things, subjecting the certification process to repeated unnecessary revisions, attempting to influence or narrow the certification provided by Plaintiff's physician, failing to timely identify and resolve alleged deficiencies, failing to timely provide approval or denial notice, denying leave for a qualifying condition, ignoring the accommodation-related request included in the leave paperwork, and revoking or confirming denial of leave after Plaintiff objected.

134. The Defendant's interference prejudiced the Plaintiff because it deprived her of protected leave, forced her to seek fallback unpaid leave under Policy 1727 by formal written request on February 20, 2025, caused her medically necessary absences to be treated as policy violations, and caused the attendance-based rationale later used to terminate her.

135. As a direct and proximate result of the Defendant's interference, the Plaintiff was terminated and suffered and continues to suffer damages, including but not limited to loss of wages, loss of employment benefits, loss of personal and professional reputation, emotional distress, and mental suffering.

136. Such conduct was in violation of 29 U.S.C. § 2615 and undertaken in bad faith.

**COUNT V**
**Retaliation in Violation of 42 U.S.C. § 2000e-3(a) Against BPD**

137. The Plaintiff repeats and re-alleges the above paragraphs as if each were set forth herein in its entirety.

138. Plaintiff engaged in protected activity under Title VII by filing EEOC complaints, filing lawsuits alleging race and sex discrimination and retaliation, making internal complaints of race and sex discrimination and retaliation, and publicly opposing discriminatory practices within BPD.

139. After Plaintiff engaged in that protected activity, BPD subjected her to materially adverse actions including retaliatory revival of stale internal disciplinary matters, interference with leave, denial and revocation of leave, AWOL-based treatment, misuse of "job abandonment" terminology as a substitute for process, and termination.

140. As a direct and proximate result, the Plaintiff has suffered and continues to suffer damages, including but not limited to loss of income, loss of employment benefits, loss of professional opportunities, loss of personal and professional reputation, other financial losses, emotional distress and mental suffering.

141. Defendants' retaliation was intentional.

## COUNT VI
### Due Process (Liberty Interest / Stigma-Plus) in Violation of the Fourteenth Amendment and 42 U.S.C. § 1983 Against BPD and Richard Worley

142. The Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

143. Defendants deprived the Plaintiff of a protected liberty interest without due process. A public employee's liberty interest is implicated where the government, in connection with termination, makes false and stigmatizing charges that damage the employee's "good name, reputation, honor, or integrity," or otherwise impose a stigma that forecloses future employment opportunities.

144. The false accusations Defendants leveled against the Plaintiff—including that she was AWOL, had abandoned her job, refused to work, remained on unapproved leave, suffered from chronic absenteeism, and had failed to perform the duties, responsibilities, and functions of an employee of any kind—were stigmatizing on their face and went directly to Plaintiff's honesty, work ethic, professional integrity, and fitness for law-enforcement employment.

145. Those accusations were used to terminate the Plaintiff's employment were of a kind likely to be disclosed to prospective employers, administrative bodies, and other decisionmakers evaluating the Plaintiff's fitness for future employment.

146. Defendants further published and perpetuated those stigmatizing accusations beyond the four corners of the termination letter by causing the Plaintiff to be treated in the unemployment process as though she had voluntarily quit while simultaneously maintaining a termination narrative based on AWOL, abandonment, refusal to work, and unapproved leave. Those contradictory publications magnified the stigma attached to the Plaintiff's discharge, deprived her of unemployment benefits, and foreseeably damaged her future employment prospects.

147. The Plaintiff was not afforded constitutionally adequate process to clear her name before or in connection with the imposition and dissemination of those false and stigmatizing charges. Instead, Defendants used the label of job abandonment and attendance-related misconduct as a shortcut to termination, denied the Plaintiff a meaningful opportunity to contest the accusations before they were affixed to her separation, and thereby deprived the Plaintiff of her liberty interest without due process of law.

148. As a direct and proximate result, the Plaintiff suffered severe reputational injury, humiliation, embarrassment, psychological trauma, emotional distress, and substantial impairment of her future employment opportunities.

**Count VII**
**Violation of Md. Code Ann., Lab. & Empl. § 3-505**
**Against BPD**

149.    The Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

150.    BPD maintains a policy and payroll practice that all accrued paid time off is due and payable to an employee upon termination. This policy and payroll practice was explicitly referenced in the Plaintiff's termination letter.

151.    At the time of the Plaintiff's separation, BPD owed the Plaintiff payment for seventeen hours of accrued but unused paid time off.

152.    BPD failed to pay the Plaintiff for her accrued paid time off within the time that the Plaintiff would have received her regular pay following her termination.

153.    As a direct and proximate result, the Plaintiff suffered lost wages due and payable.

**WHEREFORE**, the Plaintiff requests:

1.  Compensatory damages to include back pay and front pay;

2.  Special damages to include emotional distress and reputational harm;

3.  Pre-judgment and post-judgment interest;

4.  Punitive damages pursuant to 42 U.S.C. § 1983; and 42 U.S.C. §2000e

5.  Liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)

6.  Treble damages pursuant to Md. Code Ann., Lab. & Empl. § 3-507.2(b)

7.  Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), 42 U.SC. § 2000e-5(k), 29 U.S.C. § 2617(a)(3), and Md. Code Ann., Lab. & Empl. § 3-

507.2(b);

8. Reinstatement of Plaintiff's employment with BPD with her full rank, seniority, time in service, service credit, benefits, pension and retirement accrual, promotional eligibility, and all other incidents of employment restored as though there had been no break in service;

9. Such other relief as law or equity permits.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on all triable issues of fact raised by this Complaint.

Respectfully submitted
THE PLAINTIFF,


By */s/ Michael Turiello*
Michael Turiello, Esq. (30383)
Skeen Law Offices
258 E. High Street
Charlottesville, VA 22902
mturiello@skeenlaw.com

Patrick Jennings, Esq. (30362)
Ment Law Group
225 Asylum Street – 15th Floor
Hartford, CT 06103
pjennings@mentlaw.com